George **PIECZENIK**, Plaintiff–Appellant,

v.

**DYAX CORP.**, Defendant–Appellee.

No. 03–1302.

United States Court of Appeals, Federal Circuit.

DECIDED: Sept. 23, 2003.

---

Before NEWMAN, MICHEL, and RADER, Circuit Judges.

RADER, Circuit Judge.

On summary judgment, the United States District Court for the District of Massachusetts determined that Dyax Corp. did not infringe U.S. Patent Nos. 4,359,535 (the '535 patent), 4,528,266[1] (the '266 patent), and 5,866,363 (the '363 patent). *Pieczenik v. Dyax Corp.*, 226 F.Supp.2d 314 (D.Mass.2002); *Pieczenik v. Dyax Corp.*, Civ. Action No. 00–11370–RGS, 2003 WL 1562239 (D.Mass. Feb. 25, 2003). This court *affirms*.

I.

In its Markman ruling, the district court construed two phrases appearing only in the '363 patent: "from about 4 to about 12" and "at least about 10% of all possible peptide sequences" *Pieczenik*, 226 F.Supp.2d at 321. In addition to the two phrases in the claims of the '363 patent, the district court construed one claim term, "oligonucleotide," in the claims of the '363, '535, and '266 patents. *Pieczenik*, 226 F.Supp.2d at 322. After the district court construed the claims, Dr. Pieczenik moved for partial summary judgment of

---

1. The '266 patent is a divisional of the '535 patent.

infringement of the '363 patent. Dyax, in turn, cross-moved for summary judgment of noninfringement of all three asserted patents. Apparently conceding noninfringement of the '535 and '266 patents in light of the district court's claim construction, Dr. Pieczenik did not oppose Dyax's cross-motions for summary judgment of noninfringement of those patents. Accordingly, the district court granted Dyax's motion on the '535 and '266 patents.

Dr. Pieczenik, however, did not concede noninfringement of the '363 patent. Nevertheless, Dr. Pieczenik did not dispute the facts introduced by Dyax, and thus the district court deemed those facts admitted. It, therefore, granted summary judgment on the asserted claims of the '363 patent, explaining:

> Because it is undisputed that (1) Dyax's phage libraries do not meet the "about 4 to about 12" claim limitation (according to the affidavit of Robert Ladner, Dyax's Chief Scientific Officer, the smallest Dyax library is 18 nucleotide triplets in length, while the largest exceeds 100 nucleotide triplets), and (2) that Dyax's phage libraries do not meet the "at least about 10% of all possible peptide sequences" claim limitation (according to the Ladner affidavit the actual number for all libraries is less than one trillionth of the possible peptide sequences), there can be no literal infringement.

*Pieczenik,* Civ. Action No. 00–11370–RGS, 2003 WL 1562239, *2 (D.Mass. Feb. 25, 2003). The district court also determined that Dyax's accused products would not infringe the '363 patent under the doctrine of equivalents.

## II.

A determination of infringement requires two steps. "First, the court determines the scope and meaning of the patent claims asserted. [Second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir.1998) (*en banc*) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970–71 (Fed. Cir.1995) (*en banc*), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that this court reviews without deference, *Cybor,* 138 F.3d at 1456. Step two, comparison of the claim to the accused device, is a question of fact that requires the patent holder to establish that the accused device includes every claim limitation or its equivalent. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Summary judgment is appropriate where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This court reviews a grant of summary judgment by a district court *de novo. Cortland Line Co. v. Orvis Co.,* 203 F.3d 1351, 1355–56 (Fed.Cir.2000).

Dr. Pieczenik's appeal focuses solely on the district court's claim construction. This court understands that Dr. Pieczenik argues for the construction of three terms, only one of which coincides with the terms that the district court addressed. Specifically, Dr. Pieczenik appeals the constructions of "combinatorial libraries," "having," and "oligonucleotide."

"In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which patentee regards as his invention." *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256

F.3d 1323, 1331 (Fed.Cir.2001) (quotation omitted). The terms used in the claims bear a "heavy presumption" that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir.2002). With respect to the ordinary meaning of the words, a court may consult a dictionary, encyclopedia, or treatise. *Tex. Digital Sys., Inc. v. Telegenix Inc.*, 308 F.3d 1193, 1202 (Fed.Cir.2002). Moreover, "[a]bsent an express intent to impart a novel meaning, claim terms on take their ordinary meaning." *Elektra Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed.Cir.2000).

As previously noted, Dr. Pieczenik's appeal invokes two terms that were not addressed by the district court: "combinatorial libraries" and "having." As an initial matter, this court notes that "combinatorial libraries" does not appear in any of the claims of the asserted patents. Because claim construction requires focus on particular claim language, this court is reticent to construe a term not present in the claims, especially a term not construed by the district court. Accordingly, Dr. Pieczenik's challenge with respect to "combinatorial libraries" fails. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed.Cir.1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

Dr. Pieczenik argues that "having" is open-ended and, thus, equivalent to "comprising." While "having" may mean, in certain contexts, "comprising," this court has never equated the two:

> The transition "having" can also make a claim open. However, the term "having" does not convey the open-ended meaning as strongly as "comprising."

"Having," for instance, does not create a presumption that the body of the claim is open.

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed.Cir.2001) (citation omitted). Examining the term within context of the claims, this court concludes that this usage of "having" is closed.

■ The asserted independent claims of the '363 patent, namely claim 24 and 34, contain the phrases "said oligonucleotide population has a coding region having a length from about 4 to about 12 nucleotide triplets" and "each structural gene having inserted therein one member of an oligonucleotide population wherein each member of said oligonucleotide population has a length from about 4 to about 12 nucleotide triplets." '363 patent, col. 46, ll. 55–57; col. 47, ll. 56–60. Because the claims refer to a coding region that designates multiple nucleotide triplets, i.e., about 4 to about 12, the claims manifest an objective intent to close their scope to oligonucleotide populations consisting of members of specified lengths. In other words, substituting "comprising" for "having" would read the specificity–in particular, the upper bound of "about 12"–out of the claim. *See Tex. Instruments, Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed.Cir.1993). Thus, "having," in this context, is closed.

Lastly, Dr. Pieczenik challenges the construction of "oligonucleotide." Rather than construe the claim blindly, this court begins with a careful consideration of the district court's opinion regarding this claim term. *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 713 (Fed.Cir. 1998). With respect to the '535 and '266 patents, Dr. Pieczenik argued before the district court that " 'oligonucleotide' as used in these two patents would be understood by a person of ordinary skill in the

art to mean a polymer of nucleotides comprising at least a few nucleotides in length and not usually more than about 100.'" *Pieczenik*, 226 F.Supp.2d at 322 (quoting Dr. Pieczenik's Markman Brief at 18). With respect to the '363 patent, however, Dr. Pieczenik argued that the file history "'makes clear' that the 'oligonucleotide' as used in that patent signifies an oligonucleotide with 'an upper limit at about 600 to about 750 nucleotide triplets in length.'" *Id.* (quoting Dr. Pieczenik's Markman Brief at 8). But the district court dismissed Dr. Pieczenik's attempt to broaden the plain meaning of oligonucleotide using the '363 patent's prosecution history, instead construing the term according to scientific and medical texts. The district court thus construed oligonucleotide as "a compound created by the condensation of a small number of nucleotides with 20 specified as the upper limit." *Id.*

▉ Because the '535 and '266 patents[2] do not share the same lineage as the '363 patent, their claim terms in the first two patents must be construed separately. *See Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1301 (Fed.Cir.2001). Independently evaluating the specifications of the '535 and '266 patents, this court agrees that there is no "express intent to impart a novel meaning." *Elektra Instrument*, 214 F.3d at 1307. Thus, "oligonucleotide" takes its common, ordinary meaning with respect to these patents. Dyax provides three references that define "oligonucleotide."[3] The first defines it as "[a] compound made up of a small number of nucleotides (2 to 10)." *Melloni's Illustrated Medical Dictionary* 343 (1979). The second defines it as "a polymer made up of a few (2 to 10) nucleotides." *Dorland's Illustrated Medical Dictionary* 920 (26th ed. 1981). And the third defines it as "[a] compound made up of the condensation of a small number of nucleotides." *Stedman's Medical Dictionary* 980 (24th ed. 1982).[4] Because these definitions do not vary significantly, this court holds that "oligonucleotide" means, for the purposes of the '535 and '266 patents, "a compound made up of two to ten nucleotides." Even though this court adopts a slightly different claim construction than the district court, any error is harmless. A determination of noninfringement under a broader claim construction compels a determination of noninfringement under a narrower claim construction. *Cf. Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1329 (Fed.Cir.2002) ("If a reasonable juror could have found literal infringement under a more narrow reading of claim 1, then the same reasonable juror could not have avoided finding literal infringement under the correct, broader construction of the claim. Thus, the district court's error was harmless.").

2. Neither party has argued that because the '266 patent is a divisional of the '535 patent, they should be analyzed separately. Thus, the court assumes that the same interpretation should be treated as the same. *See Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1338 n. 5 (Fed.Cir.1998).

3. The ordinary, common meaning of "oligonucleotide" is not alleged to have changed between the filing date of the '535 patent, i.e., Oct. 1, 1979, and the issue dates of the '535 patent, i.e., Nov. 16, 1982, or the '266 patent,

i.e., July 9, 1985. Thus, this court need not decide which precise date among those should fix the meaning. *Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1370 n. 1 (2002).

4. A later version, published after the relevant timeframe, refines the definition: "A compound made up of the condensation of a small number (*typically less than twenty*) of nucleotides." *Stedman's Medical Dictionary* 1244 (26th ed. 1995).

The '363 patent, however, yields a different conclusion. The patentee became a lexicographer and particularly defined "oligonucleotide." *See Beachcombers Int'l, Inc. v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1158 (Fed.Cir.1994). In part, the patent states:

> The oligonucleotide population may also be composed of members, each of which contains the same number of tandem repeats of each peptide coding sequence, where the number of tandem repeats is from two to about fifty.
>
> * * * *
>
> The recombinant vector population can also be made up of individual vectors each containing the same number of tandem repeats of an oligonucleotide sequence as defined above. The number of tandem repeats can be from two to about fifty in number.
>
> The recombinant vector population can also be made up of individual vectors each containing the same number [of] tandem repeats of an oligonucleotide sequence as defined above. The number of tandem repeats can be from two to about fifty in number.

'363 patent, col. 3, ll. 58–62; col. 4, ll. 41–51. These passages indicate that an oligonucleotide has from two to about fifty tandem repeats, i.e., an oligonucleotide is a polymer with a number of nucleotides ranging from four to about one-hundred. Nevertheless, the context of the disputed claims of the '363 patent demonstrate that any error on the part of the district court was harmless.

As noted above with respect to "having," claims 24 and 34 recite similar limitations: "said oligonucleotide population has a coding region having a length from about 4 to about 12 nucleotide triplets" and "each structural gene having inserted therein one member of an oligonucleotide population wherein each member of said oligonucleotide population has a length from about 4 to about 12 nucleotide triplets." '363 patent, col. 46, ll. 55–57; col. 47, ll. 56–60. While "oligonucleotide" has a more expansive meaning set forth in the written description, these claims particularly limit the number of nucleotide triplets to a number ranging from about 4 to about 12. In other words, the *claimed* oligonucleotides are chosen from a oligonucleotide population with lengths ranging from about 4 to about 12. The *claimed* oligonucleotides, therefore, are a subset of oligonucleotides as defined by the '363 patent. It is undisputed that the smallest Dyax library is 18 nucleotide triplets in length. *Pieczenik*, Civ. Action No. 00–11370–RGS, 2003 WL 1562239 at *2. Accordingly, Dyax does not infringe claims 24 and 34 of the '363 patent.

This court considered Dr. Pieczenik's other arguments but finds none persuasive. Because the district court properly granted summary judgment of noninfringement of the '363, '535, and '266 patents, this court affirms.