MICRO CHEMICAL, INC.,
Plaintiff–Appellant,

v.

LEXTRON, INC. (formerly known as Great Plains Chemical Co., Inc.), Defendant–Appellee.

No. 02–1121.

United States Court of Appeals, Federal Circuit.

Jan. 29, 2003.

Rehearing Denied March 21, 2003.

Gregory A. Castanias, Jones, Day, Reavis & Pogue, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Lawrence D. Rosenberg and Kathleen M. Laubenstein. Of counsel on the brief was John Mozola, Mullin Hoard & Brown, L.L.P., of Amarillo, TX. Of counsel was Richard P. Holme, Davis, Graham, of Denver, CO.

Dennis J. Mondolino, Morgan, Lewis & Bockius, LLP, of New York, NY, argued for defendant-appellee. With him on the brief were Michael F. Hurley and Jeffrey M. Gold. Of counsel on the brief was Jerold I. Schneider, Piper Rudnick LLP, of Washington, DC.

Before RADER, SCHALL, and BRYSON, Circuit Judges.

RADER, Circuit Judge.

This case, which spans a fourteen-year period, has been the subject of two previous appeals to this court. *See Micro Chem., Inc. v. Great Plains Chem. Co.*, 103 F.3d 1538, 41 USPQ2d 1238 (Fed.Cir.1997) (nonobviousness); *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 52 USPQ2d 1258 (Fed.Cir.1999) (infringement). The present appeal involves only damages. The United States District Court for the District of Colorado granted summary judgment denying Micro Chemical, Inc. lost profits. The district court then conducted a bench trial to determine the proper reasonable royalty for Lextron, Inc.'s infringement of Micro's U.S. Patent No. 4,733,971 ('971 patent). Micro seeks review of the district court's judgment denying it lost profits and granting a reasonable royalty of only one percent. Additionally, Micro requests reassignment to a different judge should this case be remanded to the district court.

Because Lextron's Type 5 machine was not an available substitute, the district court erred in holding, on summary judgment, that Micro was not entitled to lost profits. Therefore, this court also vacates the reasonable royalty determination. This court denies Micro's request for a different judge on remand.

## BACKGROUND

Animal feedlots generally add microingredients to livestock and poultry feed. Microingredients are feed additives, such as vitamins, antibiotics, hormones, medicines, and nutritional supplements, that provide a balanced diet, stimulate growth, and protect the animals from disease. One method of adding microingredients to livestock and poultry feed involves mixing dry supplements that contain microingredients into the feed. Alternatively, feedlots may spread dry microingredients directly on top of the feed in the trough (called "top dressing"). Both methods have some disadvantages in that they do not ensure uniform, accurate dosages, and they limit the feedlot's flexibility to alter dosages.

Microingredient dispensing machines overcame some of those problems. These machines measure and dispense microingredients by mixing them into a liquid carrier that is sprayed over livestock and poultry feed rations. One example of such a machine measures and dispenses microingredients by volume. Micro's '971 patent claims a machine that dispenses microingredients by weight. Weigh machines measure microingredients by weight before mixing them into the liquid carrier. This technology improved on the prior volume machine technology.

Micro and Lextron both produce microingredient weigh machines. They place their weigh machines in feedlots at no cost to the feedlots. They recoup their expenses by selling microingredients to the feedlots at an eight- to ten-percent premium. Although not required by contract to do so, feedlots generally purchase their microingredients—at premium prices—from the company that placed its machine on the feedlot. In the liability phase of this case, this court held that Lextron's Type 2 weigh machine infringed the '971 patent. Lextron used primarily the infringing Type 2 machine during the infringement period, 1988 to 1997. After Micro sued Lextron in 1988, Lextron developed its Type 3 "no mix" weigh machine. The Type 3 machine had clumping problems that limited its commercial use. By 1997, there was only one Type 3 machine still in use. After this court's 1997 opinion issued, Lextron began modifying its existing Type 2 machines into a new Type 5 weigh machine.

During the damages phase, Micro sought recovery under both lost profits and reasonable royalty theories. On summary judgment, the district court held that Micro was not entitled to lost profits under either the two-supplier or the *Panduit* test. Trial proceeded on a reasonable royalty damage theory, and the court awarded Micro a royalty of one percent on Lextron's microingredient sales. Micro appealed to this court, which has jurisdiction under 28 U.S.C. § 1295(a)(1) (2000).

## DISCUSSION

■ This court reviews without deference a district court's grant of summary judgment, reapplying the same standard as the district court. *Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1355–56, 53 USPQ2d 1734, 1736 (Fed.Cir.2000). Thus, this court decides for itself whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In so doing, this court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ This court reviews a district court's damages decision for "an erroneous conclusion of law, clearly erroneous factual findings, or a clear error of judgment amounting to an abuse of discretion." *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1543–44, 35 USPQ2d 1065, 1067–68 (Fed.Cir.1995) (en banc). Availability of lost profits is a question of law reviewed without deference. *Id.* at 1544. This court reviews the methodology (i.e., accounting method) for damages for an abuse of discretion and the damage amount for clear error. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 n. 2, 17 USPQ2d 1922, 1925 n. 2 (Fed.Cir.1991).

■ The requested reassignment to a different trial judge on remand invokes a matter not within the exclusive jurisdiction of this court. Therefore, on this question, this court applies the law of the United States Court of Appeals for the Tenth Circuit. *See Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1572, 42 USPQ2d 1257, 1265 (Fed.Cir.1997); *Atari, Inc. v. JS & A Group, Inc.*, 747 F.2d 1422, 1439–40, 223 USPQ 1074, 1087 (Fed.Cir.1984) (en banc). The Tenth Circuit will reassign a different judge on remand "only when there is proof of personal bias or under extreme circumstances" showing that reassignment best serves the interests of justice. *Mitchell v. Maynard*, 80 F.3d 1433, 1448–50 (10th Cir.1996).

### I.

■ To recover lost profits a patentee must show that "but for" infringement it reasonably would have made the additional profits enjoyed by the infringer. *King Instruments Corp. v. Perego*, 65 F.3d 941, 952, 36 USPQ2d 1129, 1137 (Fed.Cir.1995). This court has not restricted patentees to any one particular method of proving "but for" causation. *Id.; see also Rite–Hite*, 56 F.3d at 1545. A patentee may resort to any method showing, with reasonable probability, entitlement to lost profits "but for" the infringement. *King Instruments*, 65 F.3d at 952; *Rite–Hite*, 56 F.3d at 1545. Once the patentee establishes the reasonableness of this inference, the burden shifts to the infringer to show that the inference is unreasonable for some or all of the lost profits. *Rite–Hite*, 56 F.3d at 1545. The *Panduit* and two-supplier market tests are recognized methods of showing "but for" causation. *See Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065, 219 USPQ 670, 675 (Fed.Cir.1983); *Rite–Hite*, 56 F.3d at 1545.

### A.

The district court found that Micro could not satisfy two of the four *Panduit* factors: demand for the patented product and absence of available, noninfringing substitutes. *See Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir.1978). Specifically, the court found that Lextron's Type 5 weigh machine was an available, noninfringing substitute, and that there was no demand for Micro's patented weigh machines.

The district court deemed the Type 5 machine available under *Grain Processing Corp. v. American Maize–Products Co.*, 185 F.3d 1341, 51 USPQ2d 1556 (Fed.Cir. 1999). In *Grain Processing*, this court reaffirmed its earlier precedent stating that a technology not on the market at the time of infringement can, in certain circumstances, constitute an available, noninfringing alternative. *Id.* at 1351–52. *Grain Processing* did not erect a rigid test for determining availability. Rather, it provided guidelines for when an alternative not actually "on sale" during the infringement period may have been readily "available" and thus part of the economic calculation of lost profits.

In *Grain Processing*, for example, the material and know-how for the alleged substitute were readily available at the time of infringement. *Id.* at 1354. According to the record in that case, the infringer "had all of the necessary equipment, know-how, and experience" to make the substitution at that time. *Id.* Therefore, the infringer was able to convert to the substitute manufacturing process in the remarkably short period of two weeks. *Id.* at 1346. In *Grain Processing*, even the ready availability of material and know-how alone did not make the substitute process "available" for the lost profits calculus. This court also weighed the fact that "the high cost of a necessary material can conceivably render a substitute 'unavailable.'" *Id.* Similarly, this court noted that the finding that an infringer had to design or invent around the patented technology to develop an alleged substitute weighs against a finding of availability. *Id.* In sum, this court in *Grain Processing* weighed the factors that would show the substitute's effect on the market.

■ In this case, the record evidence does not support the district court's grant of summary judgment on the availability of the Lextron Type 5 machine. The record shows that Lextron did not have the necessary equipment, know-how, and experience to make the Type 5 machine at the time of infringement. Lextron expended 984 hours to design the Type 5 machine and another 330 to test it. Charles Hoff, a Lextron engineer, worked full-time for several months on the design of the Type 5 machine. Thereafter, he continued to work part-time on the project, estimating that he tested and rejected five potential design changes. Lextron took over four months to convert all of its infringing Type 2 machines to Type 5 machines.

The effects of the changes also were not well known or readily available. Lextron hired consultants to help it consider the impact and effectiveness of the new designs. Lextron hired a firm to consider "alternative designs." Additionally, Lextron retained a Ph.D. nutritionist "to assure the effectiveness of the new designs in delivering the microingredients to the animal feed."

The summary judgment record also shows that the materials for the alleged substitutions were not readily available. Lextron requested a 120–day extension to delay the injunction on the use of its Type 2 machines because the "parts required for the conversion" were "difficult to obtain in bulk, particularly since some must be specially fabricated according to our specifications and most are not maintained in inventory." Thus, in Lextron's own words, the needed materials and equipment were "difficult to obtain in bulk," "specially fabricated," and "not maintained in inventory." This record shows that the Type 5 machine was not available at the time of infringement. To the contrary, the record shows that Lextron designed around the patented technology after Micro established infringement.

■ The district court also granted summary judgment on the *Panduit* demand factor, finding no demand for the patented technology. The record does not provide a basis for granting summary judgment on this point. Although the parties provided the patented weigh machines to feedlots at no cost, the record indicates that these machines had benefits over other methods. Indeed, the number of weigh machines in commercial use increased during the infringement period. Both Micro and Lextron made profits on placement of their machines. Lextron advertised its weigh machines as providing "accurate mixing and delivery" benefits. Drawing all reasonable factual inferences in Micro's favor, this record at least raises a genuine

issue of material fact concerning demand. A reasonable jury could find demand for the patented features of Micro's weigh machines.

In sum, the district court erred in granting summary judgment that the Type 5 machine was an available substitute for the patented invention at the time of infringement. This court reverses the grant of summary judgment of availability. The district court should have granted summary judgment that the Type 5 machine was not available at the time of infringement. Because the Type 5 machine was not available during the infringement period, this court need not reach the question of whether the Type 5 machine infringes the '971 patent. On the question of demand, this court vacates the grant of summary judgment. Based on this record, Micro is entitled to an opportunity to prove lost profits under the *Panduit* test.

### B.

The district court additionally held that Micro could not resort to the two-supplier market test to prove entitlement to lost profits. The court reached this conclusion based on its belief that the relevant market was microingredients—a market with more than two suppliers.

■ Admittedly, this court's precedent has not reconciled completely the two-supplier test with the *Panduit* test. Nevertheless, that precedent does provide the necessary framework for application of the two-supplier market test. In *State Industries, Inc. v. Mor–Flo Industries, Inc.*, 883 F.2d 1573, 1578, 12 USPQ2d 1026, 1029 (Fed.Cir.1989), this court stated:

In the two-supplier market, it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales. In these

instances, the *Panduit* test is usually straightforward and dispositive.

Thus, under the two-supplier test, a patentee must show: 1) the relevant market contains only two suppliers, 2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer, and 3) the amount of profit it would have made from these diverted sales. *See id.; cf. Lam,* 718 F.2d at 1064. In essence, the two-supplier market test collapses the first two *Panduit* factors into one "two suppliers in the relevant market" factor.

■ The first step in a two-supplier test is to define the relevant market. In *Crystal Semiconductor,* this court stated:

[T]o determine a patentee's market share, the record must accurately identify the market. This requires an analysis which excludes alternatives to the patented product with disparately different prices or significantly different characteristics.

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.,* 246 F.3d 1336, 1356, 57 USPQ2d 1953, 1964 (Fed.Cir.2001); *cf. Grain Processing,* 185 F.3d at 1355 ("Where the alleged substitute differs from the patentee's product in one or more of these respects [i.e., intended use, physical and functional attributes of product, price], the patentee often must adduce economic data supporting its theory of the relevant market in order to show 'but for' causation."). The proper starting point to identify the relevant market is the patented invention. The relevant market also includes other devices or substitutes similar in physical and functional characteristics to the patented invention. It excludes, however, alternatives "with disparately different prices or significantly different characteristics." *Crystal Semiconductor,* 246 F.3d at 1356. Once the market is defined, it generally becomes an easier task to deter-

mine how many suppliers operate in the defined relevant market. That inquiry focuses on the number of companies involved, not the number of alternatives in the relevant market.

If the patentee shows two suppliers in the relevant market, capability to make the diverted sales, and its profit margin, that showing erects a presumption of "but for" causation. Although the burden of persuasion remains with the patentee, the burden of going forward then shifts to the infringer. The infringer may rebut the presumption by showing that the patentee reasonably would not have made some or all of the diverted sales "but for" the infringement. For example, the infringer may rebut the presumption by showing that it sold another available, noninfringing substitute in the relevant market. This situation would arise only where there are two suppliers in the market, but the infringing supplier had two available alternatives: one infringing and the other noninfringing. In that situation, even absent the infringement, customers may have selected the infringer's available, noninfringing alternative over the patented invention. *See Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142, 17 USPQ2d 1828, 1832 (Fed.Cir.1991) (alternative must not have disparately different price or significantly different characteristics).

 In the present case, the district court erred in its construction of the relevant market. The court mistook the tied market from an earlier asserted patent misuse claim as the relevant market in the lost profits context. There are two markets involved in a patent misuse claim—the tied market (microingredients) and the tying market (microingredient weigh machines). Although Micro argued, in the patent misuse claim, that the tied market was microingredients, a market with many suppliers, the record does not show that

Micro defined the relevant market for lost profits to be microingredients. Defining the relevant lost profit market to be microingredients actually excludes the patented invention from the relevant market, a result inconsistent with this court's teachings in *Crystal Semiconductor*, 246 F.3d at 1356, and *Grain Processing*, 185 F.3d at 1355.

The patented invention includes a microingredient weigh machine, the starting point for defining the relevant market. *See* '971 patent, col. 31, l. 35. Although some feedlot customers switched from weigh machines to feed supplements during the infringement period, feed supplements differ in physical and functional characteristics from weigh machines and thus are not part of the relevant market. The relevant market is for machines that dispense microingredients by weight. Because the district court denied Micro access to the two-supplier test, the record may not adequately reflect the number of suppliers in the microingredient weigh machine market. Although John Jarosz, one of Lextron's experts, testified that this may well be a two-supplier market, Micro must show on remand, with reasonable probability, that there are only two suppliers of microingredient weigh machines.

In sum, based on this record, the district court erred in holding that Micro could not resort to the two-supplier market test to prove lost profits. On remand, Micro is entitled to use either the *Panduit* or the two-supplier test to show "but for" causation. By virtue of this decision on lost profits, this court must vacate the district court's reasonable royalty calculation to the extent that Micro can show entitlement to lost profit damages. The district court may recalculate any reasonable royalty on sales for which Micro may not be able to show lost profits. Finally, because it was reasonably foreseeable that Micro would

have made profits from microingredient sales earned by virtue of placing its patented microingredient weigh machines on feedlots, a damage calculation based on lost microingredient sales is appropriate under *Rite–Hite. See Rite–Hite,* 56 F.3d at 1546.

## II.

 Micro asks this court to reassign this case to a different trial judge on remand. The Tenth Circuit will reassign to a different judge when there is proof of personal bias or when reassignment best serves the interests of justice. *Mitchell,* 80 F.3d at 1448–50. As the Supreme Court has noted, "judicial rulings almost never constitute a valid basis for a bias or partiality motion." *St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.,* 309 F.3d 680, 713 (10th Cir.2002) (quoting *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)); *see also United States v. Young,* 45 F.3d 1405, 1415 (10th Cir.1995); *Mackler Prods., Inc. v. Cohen,* 225 F.3d 136, 147 (2d Cir.2000).

Here, Micro's only ground for reassignment is that this court has twice reversed portions of the district court's holdings. Nothing in the record suggests that the judge has a personal bias against Micro or that the court is unwilling to give Micro a fair trial. Micro has not shown that the district court judge displayed "deep-seated favoritism or antagonism" that would make fair judgment impossible. *See Young,* 45 F.3d at 1415 (quoting *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147). Indeed, the judge expressly stated that she would "follow the dictates of the circuit court, whether it be the Tenth or the Federal." In sum, the interests of justice do not demand reassignment. This judge knows the record better than any other trial judge. The interests of justice are best served by having this judge resolve the damages issues. This court denies Micro's request for reassignment to a different trial judge.

## CONCLUSION

The district court erred in holding, on summary judgment, that Micro was not entitled to lost profits. Accordingly, this court vacates the grant of summary judgment barring Micro from presenting its lost profits case. The district court also erred in finding that Lextron's Type 5 machine was available during the infringement period. To the contrary, the record shows no genuine issue of material fact on this question. Because that record evidence shows that the Type 5 machine was not available during the infringement period, this court reverses the denial of Micro's motion for partial summary judgment only to the extent it concerned availability. These holdings require that this court also vacate the district court's reasonable royalty determination to the extent Micro proves its lost profits. Micro's request for a different judge on remand is denied.

## COSTS

Each party shall bear its own costs.

*REVERSED–IN–PART, VACATED–IN–PART, and REMANDED.*